BELLE ROSEWATER *vs.* JEAN'S INC.

MAY 16, 1947.

PRESENT: Moss, Capotosto, Baker and Condon, JJ.

CONDON, J.   This is a petition for compensation under the workmen's compensation act, general laws 1938, chapter 300. After a hearing in the superior court, the petition was denied and dismissed on the ground that the petitioner had failed to prove by a fair preponderance of the evidence that she has suffered any incapacity for work resulting from any injury sustained by accident arising out of and in the course of her employment. A decree to that effect was duly entered in the superior court, and from that decree petitioner has appealed to this court.

Petitioner has set out in her reasons of appeal five separate and distinct reasons, but in her brief and oral argument she relies only upon the contentions "that there was no legal and competent evidence upon which the Trial Justice could base his findings of fact" and that he "erred in his application of the law to the facts as found." We shall consider her appeal as resting upon those contentions. If such findings are entirely without legal evidence to support them they are erroneous, as a matter of law, and must be set aside by this court. *Jillson* v. *Ross,* 38 R. I. 145. To determine this question we have recourse to the transcript not, however, to weigh the evidence or pass upon the credibility of the witnesses, as that is the exclusive province of the trial justice, and under §6 of article III of the workmen's compensation act his findings of fact, if based on some legal evidence, are, in the absence of fraud, conclusive upon us.

After carefully reading the transcript we are of the opinion that there is legal evidence tending to prove that the peti-

tioner was not incapacitated for work by reason of the accident arising out of and in the course of her employment. That opinion is based on the following facts. On March 31, 1945 petitioner, while at work in her employer's store, slipped and fell on the floor and in falling struck her side, chest and the back of her head against a bin. As a result she felt severe pain and became very dizzy, but nevertheless continued at her work for the remainder of the day, which was Saturday. On Monday, April 2, 1945, she reported for work as usual and continued to work until April 25, 1945, when she informed her employer that she was unable to work any longer because of her injuries.

In the meantime she had been treated by Dr. Daniel D. Young late in the afternoon of April 2, 1945 and on several other days thereafter until May 5, 1945 when he saw her for the last time and advised her to return to work. On that day he examined her and found some swelling and ecchymosis over the anterior surface of the left lung and a contused, tender area over the right scapula. There were no objective symptoms of other injury and an X ray showed no fractures. However, because of her subjective symptoms, consisting of complaints of pains in various parts of her body, Dr. Young advised baking and massage of a "painful knee area and right sacro-iliac area"; and a physiotherapist in Dr. Young's office gave petitioner a number of such treatments, but none later than May 5, 1945.

Petitioner's complaints continued to change and, as Dr. Young could not connect them with her injury, he finally concluded on April 25, 1945 that she might be suffering from hysteria. Being of that mind he arranged to have her examined by Dr. Harvey B. Sanborn, a specialist in neuropsychiatry. Doctor Sanborn examined petitioner on April 30, 1945 and made a report of his findings on May 4, 1945. From the nature of that report Dr. Young concluded that petitioner was suffering from traumatic neurosis and as he could do nothing for her in the cure of that ailment he discharged her, on May 5, 1945, as his patient. Doctor Young testified

that, in his opinion, petitioner, as far as her injuries were concerned, was able to return to work on April 14, 1945.

Dr. Sanborn saw petitioner professionally on three occasions. The first time, on April 30, 1945, he talked to her about her injuries and complaints and examined her; the second time, on August 30, 1945, he merely questioned her concerning her condition and received complaints of pains in various other parts of her body; and the third time, on October 30, 1945, he gave her a further detailed examination. He testified that on April 30, 1945, after obtaining a history of her complaints, he gave her a "pretty extensive" examination and had "her strip down pretty well and went all over her for neurological signs." He found nothing objectively to connect up her complaints with the accident, except that her hand grasp was weak which might indicate a depressed condition. In questioning her he noted a tendency in her to be emotionally upset.

From the examination of October 30, 1945 he concluded that petitioner "had no organic neurological condition; that is, that was connected up with the injury at all." From both examinations he formed the opinion "that she was suffering from a psycho-neurotic condition of what we speak of as the anxiety neurosis type." He testified that generally such a condition is brought about by emotional upsets, and that "Any emotional disturbance that may go over a long period of time, so mild perhaps as to hardly be noticed by the patient, but going on over a long period of time, any emotional conflict, as we say, fear or hate or resentment, we feel brings on the anxiety state."

Doctor Sanborn reported the results of the above examinations and two of these reports are in evidence. After the first examination he reported as follows: "This woman apparently fell while at work sustaining various contusions and strains which were somewhat painful and disabling for a short period. The direct effect from these is probably practically fully recovered from by this time. As a result of the injury, she became very fearful that she might suffer

prolonged disability, which she could ill afford to do. This is largely responsible for her present complaints and disabilities, which are now due to her psychoneurotic condition of the anxiety-hysteria type. Of course, the injury is primarily largely responsible for this, but it is something from which she should make a complete recovery in a short time, if only she can get rid of her fears and anxieties." After the third examination he reported: "Symptoms from physical findings in this woman are still much too many for me to explain them on the basis of any organic condition of the nervous system. To me they still point, as they did on my previous examination, to a psychoneurotic condition of the anxiety-hysteria type, precipitated by the fall and injury to her back."

Doctors Young and Sanborn were witnesses for the respondent. Petitioner presented one medical witness, Dr. Henry J. Gallagher, who attended her in the latter part of July, 1945. He also ordered an X ray and the report showed substantially the same condition as the report of the X ray obtained by Dr. Young. However, Dr. Gallagher was more impressed than Dr. Young had been with a portion of the report which showed an old condition of "hypertrophic arthritis in the spine" near the neck and he testified: "while it may not have been caused by the accident, certainly could have been aggravated by a fall." Upon counsel for respondent objecting to the expression "It could have been", the witness changed it to "It would have been." He testified that, on his examination of the petitioner, he found "pain on pressure at the midline in the lumbar spine, pain over both her sacro-iliac joints, and pain on the third dorsal on the left." On this he based the opinion that she was suffering from neuritis which, in view of the history of the accident that he received from petitioner, could have been caused when she "fell backwards and struck her lower spine and struck the back of her head". He also testified that, by reason of her many complaints, multiplicity of symptoms and the change in them from day to day during his treatment of her, he was forced to conclude

that petitioner was suffering from "traumatic hysteria in addition to her organic complaints." And he further testified that the hysteria "was probably induced by the fall or traumatism", and that petitioner was unable to perform her ordinary employment.

The above is a brief summary of the most important parts of the medical evidence which is relied upon by each party. None of the medical witnesses obtained any history of the petitioner prior to her employment by the respondent. She informed each of them that, prior to the accident, her health was good; that she had no nervous or hysterical symptoms; and that she was happy and contented in her work. In other words, she gave the impression that there was nothing troubling her until after she had suffered the accident on March 31, 1945. Such was also the impression she sought to convey to the superior court when she was on the witness stand, as is evidenced by the following answer which she made to a question propounded in cross-examination: "Mr. Jordan, may I say I never take medicine and so don't go to doctors. I have never been sick in my life." And later in the same cross-examination she testified: "I say I never knew doctors. I never went to doctors. I never took medicine in my life."

Such was the state of the evidence when the parties rested on December 19, 1945 and the trial justice took the case under advisement. Later, however, on February 18, 1946, on motion of the respondent and before the trial justice had rendered his decision, the case was ordered to be reopened and on May 8, 1946 it was further heard. At that hearing it appeared that petitioner, before coming to work for the respondent in Providence, had worked for Elton's, Inc., a store in Fall River, Massachusetts, from early in the spring of 1944 until some time in August of that year when her employer "let her go". During that time she was sick with a nose infection and was hospitalized at Union Hospital in Fall River from May 28 to June 7, 1944. It also appeared that thereafter she brought a law suit against Elton's, Inc., which was tried

in the superior court in Fall River in October, 1945. At that trial she testified that she took sick on May 22, 1944 and was confined to the hospital where she was attended by two doctors.

In the case at bar it further appears from the testimony of the owner of Elton's, Inc. and petitioner's former fellow employees in that store that she was a very nervous woman, always had "lots of complaints" about her health, was absent from her employment by reason of illness for about three weeks, chronically complained that she had headaches and that her health was being undermined by hard work at Elton's, Inc. The hospital record of her case while she was at the Union Hospital was admitted in evidence and it shows that she gave the following history when she was admitted: headaches; dizziness and nausea; pain in both eyes, more in left; subject to frequent infections. It further appeared in evidence that petitioner became involved in a controversy with Elton's, Inc. in which she charged her employer with not paying her some of her wages.

The weight of all this evidence, as well as the credibility of the petitioner and all the other witnesses, were matters for the consideration solely of the trial justice. We have summarized such evidence merely to show that whatever the situation may have been at the close of the hearing on December 19, 1945, it is clear that when the case was finally closed on May 8, 1946 the trial justice was confronted with a real conflict in the evidence on the question whether the petitioner had been disabled by the accident of March 31, 1945. The fact that the petitioner had not told Dr. Sanborn about her troubles in Fall River could well have led the trial justice to discredit the doctor's opinion that the fall on March 31, 1945 in respondent's store in Providence "precipitated" the anxiety hysteria from which he found her to be suffering, and this because petitioner had given him an incomplete history and in some respects an untrue history, upon which the doctor was forced to form his opinion. And

for like reasons the same might be said of Dr. Gallagher's opinion.

In any event the record shows that there was legal evidence to support the finding of the trial justice that petitioner had not sustained the burden of proving by a fair preponderance of the evidence that she was incapacitated for work as a result of the accident which she suffered on March 31, 1945. In this connection it is to be borne in mind that it is the duty of the petitioner to present evidence upon which a finding of fact that she is disabled can be based, and not the duty of the respondent to prove the contrary. If the respondent's evidence has raised a question as to the probative value of the petitioner's evidence in discharging her burden, the resolution of that question falls within the realm of fact finding with which this court has nothing to do.

For the above reasons we cannot say that the trial justice has failed to apply the correct law to the facts. Nor do we think that his rulings on the exclusion and admission of certain evidence erroneously affected the evidence upon which a correct decision could be based. We have examined the rulings objected to by the petitioner and are satisfied that all of her exceptions thereto are clearly lacking in merit.

The petitioner's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court.

*Irving Brodsky,* for petitioner.

*Sherwood & Clifford, Sidney Clifford, Raymond E. Jordan,* for respondent.